**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ROBERT A. HOFFMAN,**                                    Case No. 1:18 CV 2123

    Plaintiff,                                                   Judge Dan Aaron Polster

    v.                                                               Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                                **REPORT AND RECOMMENDATION**

## INTRODUCTION

Plaintiff Robert A. Hoffman ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated September 17, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in January 2016, alleging a disability onset date of March 15, 2009. (Tr. 198-99). His claims were denied initially and upon reconsideration. (Tr. 111-13, 119-21). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 126-27). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on October 25, 2017. (Tr. 32-73). On February 12, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-25). The Appeals Council denied Plaintiff's request for review,

making the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on September 17, 2018. (Doc. 1).

### FACTUAL BACKGROUND[1]

Personal Background and Testimony

Plaintiff was born in 1979, making him 38 years old at the time of the hearing. *See* Tr. 222. Plaintiff alleged disability due to back injuries, the inability to sit or stand for lengthy periods, nerve damage in both legs, memory problems, anxiety, depression, and limited use of his right hand. (Tr. 226).

Plaintiff had past work as a carpenter. (Tr. 37, 39-40). He believed he could no longer work due to problems with his right hand and persistent back pain which impaired his ability to walk. (Tr. 51). Plaintiff sustained a workplace injury to his lower back in 2006 while employed as a carpenter for a flooring company. *See* Tr. 50. He returned to work following the injury. (Tr. 51).

Plaintiff had four back surgeries and was due for a fifth later in 2017. (Tr. 44). Plaintiff was "optimistic" following his second surgery and believed he could "bounce right back" leading him to "push [himself] a little harder than [he] should've" in therapy. (Tr. 65). Plaintiff further believed he was not properly supervised during physical therapy due to staffing issues. (Tr. 65-66). He had some relief following surgery, but "twist[ed] the wrong way" during an exercise and reaggravated the injury. (Tr. 47).

---

1. Plaintiff only challenges the ALJ's evaluation of a spinal Listing and of the opinion of a physician who treated his spinal condition. (Doc. 11, at 6-15). Therefore, the undersigned only summarizes those records relevant to his arguments. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief are waived).

Plaintiff described his pain as "constant". (Tr. 47). He was unable to bend down and grab objects and had difficulty reaching. *Id*. Plaintiff could not lay flat on his back or flat on his stomach. (Tr. 48).

Relevant Medical Evidence

Plaintiff had a normal lumbar spine x-ray in April 2009. (Tr. 729). In October 2010, an MRI revealed a "fairly massive disc extrusion" extending caudally from the interspace level and marked compression of the thecal sac and of the nerve root sleeves bilaterally. (Tr. 399). There was also "prominent" disc degeneration at the L4-L5 and L5-S1 levels and a central bulging disc at the L4-L5 level with an associated annular tear. *Id*.

Plaintiff began treating with Louis Keppler, M.D., in May 2011. (Tr. 313). At his first visit, Plaintiff complained of low back pain, right leg radiculopathy, and right leg weakness. *Id*. Plaintiff had these symptoms since 2006, but they worsened over the past year. *Id*. Plaintiff had 10/10 pain, worse with sitting, walking, standing, lying down, coughing, and lifting. *Id*. Physical therapy and cortisone injections did not relieve the pain. *Id*. Dr. Keppler recommended surgery. *Id*.

Dr. Keppler performed a posterior lumbar interbody fusion with a plate at L5-S1 in June 2011. *See* Tr. 314. Approximately two weeks after the surgery, Plaintiff saw Dr. Keppler and was "doing great". (Tr. 316). At an August 2011 follow-up, Plaintiff was "doing well" and Dr. Keppler noted his wound was healing well with no redness or swelling. (Tr. 317). In September, Dr. Keppler observed Plaintiff was making slow progress. (Tr. 318). His preoperative back and leg pain improved, but he still had residual back pain and numbness in his legs. *Id*. Dr. Keppler advised Plaintiff to avoid any activity which increased his pain level. *Id*. In January 2012, Plaintiff was doing "reasonably well", but was still sore. (Tr. 320). Dr. Keppler noted Plaintiff's recent x-rays looked "excellent". *Id*.

3

Plaintiff returned to Dr. Keppler in May 2012 "in severe pain". (Tr. 322). Dr. Keppler believed Plaintiff's fusion was consolidating at L5-S1, and his adjacent level condition may have progressed. *Id*. He recommended an MRI. *Id*. Plaintiff returned two weeks later "leaning forward" while walking and "holding onto the furniture to get in and out of the office." (Tr. 323). Plaintiff complained of "severe aggravation" of his back pain, and pain and swelling in his lower extremities. *Id*. Dr. Keppler found some foraminal narrowing associated with further degeneration at L4. *Id*. He noted the prior fusion at L5-S1 looked "good". *Id*. Dr. Keppler recommended surgery, believing Plaintiff's fusion needed to be extended to the L4 level. *Id*. Dr. Keppler also noted the possibility of more conservative treatments such as lumbar blocks. *Id*.

Dr. Keppler performed a bilateral paraspinal injection (facet area) at L4-L5 in July 2012. (Tr. 341). Plaintiff underwent an operation in September 2012 to remove "painful hardware" in his back. (Tr. 294).

A November 2012 lumbar CT scan revealed a moderate to severe broad-based central/paracentral disc bulge at L4-L5. (Tr. 305). There was moderate canal stenosis at this level with moderate to severe foraminal narrowing. *Id*. At L3-L4, Plaintiff had a mild broad-based central/paracentral disc bulge with moderate canal stenosis and neural foramina present. *Id*. Additionally, at L1-L2, Plaintiff had a mild to moderate broad-based left foraminal/extraforaminal disc bulge. *Id*.

Plaintiff returned to Dr. Keppler in December 2012 with "significant" back pain, but less leg pain. (Tr. 330). He ambulated with a cane. *Id*. Dr. Keppler believed Plaintiff's L4-L5 condition had worsened. *Id*. Plaintiff had stenosis at L4-L5, above the level of his prior fusion. *Id*. He also had herniated discs both at L4 and L5, for which Dr. Keppler recommended surgery. *Id*.

4

Plaintiff began treatment at the Cleveland Back and Pain Management Center in May 2013. *See* Tr. 495. Plaintiff reported muscle weakness and pain in his joints and back. (Tr. 496). Providers found he had an antalgic gait and ambulated with a cane. (Tr. 497). He had reduced muscle strength and diminished reflexes in both legs. *Id*. Plaintiff also had limited range of motion in his lumbar spine. *Id*.

Plaintiff had a June 2013 pre-operative appointment with Dr. Keppler. (Tr. 331). Dr. Keppler noted Plaintiff walked "slightly bent forward", ambulated with a cane, and was "very stiff". *Id*. On examination, Plaintiff could bend forward and bring his fingertips to the proximal pole of his patella. *Id*. He could assume an upright position with a slight reversal of spinal rhythm with his knees flexed. *Id*. At a pain center visit in that same month, Plaintiff had limited range of motion in his lumbar spine, decreased motor strength in both legs, and positive straight leg tests (seated and supine). (Tr. 493-94).

Plaintiff underwent an extreme lateral interbody fusion at L4 with Dr. Keppler in July 2013. (Tr. 337). At a post-operative appointment in late July, Plaintiff still had "a lot" of pain, and described "burning" in his left anterior thigh. (Tr. 332). Dr. Keppler noted Plaintiff's x-rays looked "good", and his incisions were well healed. *Id*.

Plaintiff returned to the pain center in late July, following his operation. (Tr. 486). Providers noted Plaintiff had an antalgic gait and ambulated with a cane. *Id*. He had tenderness throughout his lumbar spine and normal motor strength in both legs. (Tr. 486-87). Plaintiff also had bilateral negative seated straight leg tests and positive supine straight leg tests. (Tr. 487).

In September 2013, Plaintiff had a "typical side ache" and some difficulty with hip flexion. (Tr. 333). Dr. Keppler instructed Plaintiff to build his endurance by walking. *Id*. In October 2013, Dr. Keppler wrote a letter to Anthony Wyras, M.D., summarizing Plaintiff's post-operative

5

progress. (Tr. 334). He described Plaintiff's condition as "longstanding" with "adaptive patterns of walking" and noted he was "kinesiophobic". *Id.* At a pain clinic visit later that month, Plaintiff reported back pain and swelling in his extremities. (Tr. 467). The provider noted he walked with a limp, had an antalgic gait, and ambulated with a cane. (Tr. 468). Plaintiff had normal motor strength in both legs, but diminished reflexes and positive seated straight leg tests bilaterally. *Id.*

At a November 2013 pain center visit, Plaintiff reported general muscle aches and weakness with back pain and swelling in his extremities. (Tr. 463). He walked with a limp, had an antalgic gait, and ambulated with a cane. (Tr. 464). He again had normal motor strength in both legs, but diminished reflexes, limited range of motion in his lumbar spine, and positive seated straight leg tests bilaterally. *Id.* These findings were unchanged at a December pain center visit. *See* Tr. 459-60.

A December 2013 CT scan revealed probable posterior extension of residual disc annulus versus perithecial fibrosis, but an MRI was needed to confirm. (Tr. 310-11). There were minor degenerative changes and mild central canal stenosis at L3-L4. (Tr. 310). At L4-L5, Plaintiff had moderate attenuation of the thecal sac with bilateral foraminal narrowing. *Id.*

At a January 2014 follow-up with Dr. Keppler (after his date last insured), Plaintiff was feeling "somewhat better". (Tr. 335). Dr. Keppler was "very pleased with the appearance of the XLIF procedure at L4". *Id.* He was "encouraged" by Plaintiff's "early result". *Id.* At a pain center visit later that month, Plaintiff walked with a limp, had an antalgic gait, ambulated with a cane, and had pain with sitting and standing. (Tr. 455). He stood forward in a flexed position. *Id.* Plaintiff had normal motor strength in both legs. *Id.* However, Plaintiff had limited range of motion in his lumbar spine, diminished reflexes in both legs, and positive seated straight leg tests bilaterally. *Id.*

6

In March, Plaintiff reported exercising on his own at a gym three times per week, losing 40 pounds doing so. (Tr. 336). Dr. Keppler noted Plaintiff's x-rays showed his implant was in "good alignment" and solid bone consolidation at the fusion level. *Id.*

Opinion Evidence

In April 2016, State agency physician Elaine Lewis, M.D., provided a physical residual functional capacity assessment. (Tr. 84-86). She opined Plaintiff could occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds. (Tr. 84). Plaintiff could stand and/or walk for four hours and sit for six hours in an eight-hour workday. *Id.* She found Plaintiff unlimited in his ability to push or pull. *Id.* He could occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. (Tr. 84-85). Plaintiff could never climb ladders, ropes, or scaffolds. (Tr. 84). She opined Plaintiff was unlimited in his ability to feel or reach in any direction (including overhead), but limited in his handling and fingering abilities on the right side. (Tr. 85). Finally, she found Plaintiff needed to avoid all exposure to hazards such as machinery and heights. (Tr. 86). In May 2016, State agency physician William Bolz, M.D., concurred with Dr. Lewis's findings. (Tr. 99-102).

In October 2017, Dr. Keppler completed a medical source statement. (Tr. 1152-55). He opined Plaintiff could occasionally[2] lift and carry one to five pounds; rarely[3] lift and carry six to ten pounds; and never lift and carry more than ten pounds. (Tr. 1153). Plaintiff could occasionally reach (in any direction), and occasionally handle or finger bilaterally. (Tr. 1153-54). Dr. Keppler opined Plaintiff could stand for two hours total in an eight-hour workday, but only for fifteen

---

2. The form defines "occasionally" as "up to 1/3 of the time – up to 2 ½ to 3 hours per day". (Tr. 1152).

3. The form defines "rare" as being "no more than 10 percent of the day – less than 1 hour per day". (Tr. 1152).

minutes at a time. (Tr. 1154). He could walk for less than one hour total during a workday, but only ten to fifteen minutes at a time, and could sit for less than four hours total, but only thirty minutes at a time. *Id*. Plaintiff could not operate foot controls, bend, crouch/squat, crawl, or climb steps or ladders. *Id*. He could reach above shoulder level. *Id*. Dr. Keppler found Plaintiff's condition was likely to deteriorate if placed under job related stress. *Id*. He noted Plaintiff's condition existed and persisted with the restrictions as outlined in the opinion since (at least) March 15, 2009. *Id*. Finally, he found Plaintiff would likely be absent two or more days per month due to his condition. (Tr. 1155).

Dr. Keppler wrote a letter which accompanied his medical source statement. (Tr. 1150-51). In it, he detailed Plaintiff's diagnoses and course of treatment through 2017, and he restated the opinions contained in the medical source statement. *See id*.

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 66-73. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Plaintiff to be. (Tr. 67-69). The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a table worker, final assembler, or a bonder. (Tr. 68-70).

ALJ Decision

In a written decision dated February 12, 2018, the ALJ found Plaintiff last met the insured status requirements for DIB on December 31, 2013 and had not engaged in substantial gainful activity from his alleged onset date (March 15, 2009), through his date last insured. (Tr. 14). She concluded Plaintiff had the severe impairments of: degenerative disc disease, status post two spinal fusion surgeries; remote deformity fracture of the fifth metacarpal of the right hand; dysthymia;

and generalized anxiety disorder, but found these impairments (alone or in combination) did not meet or medically equal the severity of a listed impairment. *Id*. The ALJ then set forth Plaintiff's residual functional capacity ("RFC") through his date last insured

> [He] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he was limited to standing/walking 4 hours; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; frequently balance; handling and fingering with the right upper extremity was limited to frequent; avoid all exposure to hazards such as dangerous machinery, unprotected heights, and commercial driving. Mentally, he was limited to simple routine type work, with no fast-paced production quotas for time or quantity; limited to brief superficial interactions with others defined as speaking, signaling, and serving; and no management type work, directing the work of others, conflict resolution, or being responsible for the safety of others. He had to use a cane when ambulating distances greater than five feet and on uneven ground.

(Tr. 16). The ALJ found Plaintiff was unable to perform past relevant work; was defined as "a younger individual" on the date last insured and had a limited education. (Tr. 23). The ALJ concluded that, considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. *Id*. Thus, the ALJ found Plaintiff not disabled from March 15, 2009, the alleged onset date, through December 31, 2013, the date last insured. (Tr. 24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff raises two challenges to the ALJ's decision: 1) that she failed to properly evaluate whether Plaintiff met or equaled Listing 1.04; and 2) that she failed to properly evaluate the opinion of Dr. Keppler, Plaintiff's treating spinal specialist. (Doc. 11, at 6-15). The Commissioner responds that the ALJ's decision is supported by substantial evidence in both regards. (Doc. 13, at 7-16). For the following reasons, the undersigned finds the ALJ's analysis of Listing 1.04, and of Dr. Keppler's medical source opinion, is not supported by substantial evidence and recommends the decision be reversed and remanded.

Step 3 Finding – Listing 1.04

First, Plaintiff argues the ALJ failed to adequately evaluate whether Plaintiff met, or equaled, Listing 1.04. (Doc. 11, at 6-10). The Commissioner responds that the ALJ's findings are supported by substantial evidence. (Doc. 13, at 7-10). For the reasons stated below, the undersigned finds the ALJ's analysis of Listing 1.04 is unsupported, and recommends the decision be reversed in this regard.

Plaintiff bears the burden at Step Three of establishing that his impairments meet or medically equal a listing. *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987); *Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 645 (6th Cir. 2006). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the

11

Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Importantly, "[a] claimant must satisfy all of the criteria to meet the listing," *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). The claimant has the burden to prove all elements of the listing are satisfied. *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984).

At Step Three the ALJ must "actually evaluate the evidence, compare it to [the applicable] listing, and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds*, 424 F. App'x at 416. As the Sixth Circuit has explained, however, *Reynolds* does not require remand due to lack of explanation unless the claimant can "point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing" and "[a]bsent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (distinguishing *Reynolds*; internal citations omitted). In instances where the ALJ does not address a listing, the court must "determine whether the record evidence raises a substantial question as to [Plaintiff's] ability to satisfy each requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432. Plaintiff "must point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing." *Id.* at 432.; *see also Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 642 (6th Cir. 2013) ("A substantial question about whether a claimant meets a listing requires more than . . . a mere toehold in the record on an essential element of the listing."). Here, the ALJ cited the listing at issue, but Plaintiff contends her analysis was incorrect and inadequate. This

same rationale in *Smith-Johnson* and *Sheeks* logically applies to an allegedly incorrect evaluation of a listing as it does to the failure to address a listing.

> Under the regulations, to meet Listing 1.04, a plaintiff must show:
>
> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.04. Thus, to meet Listing 1.04, Plaintiff must show he satisfies the criteria in the introductory paragraph *and* one of the criteria set forth in (A), (B), or (C).

> Here, at Step Three, the ALJ explained:
>
> In particular, the undersigned considered the claimant's physical impairments under the requirements of Listing 1.04 regarding disorders of the spine, but there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain with motor loss, sensory or reflex loss, and positive straight-leg raising testing (both sitting and supine) or spinal arachnoiditis. Furthermore, the claimant was not extremely limited in the ability to walk as required by l.00B2b.

(Tr. 14). Plaintiff argues this analysis is unsupported because there is sufficient record evidence that he meets the criteria set forth above in subsection (A). *See* Doc. 11, at 6-10. The undersigned

13

agrees that the ALJ's reasoning here is factually inaccurate and finds Plaintiff has pointed to evidence which raises a substantial question as to whether he could meet Listing 1.04(A).

First, as evidence he satisfies the introductory criteria – a disorder of the spine evidenced by compromise of the nerve root or spinal cord – Plaintiff points to MRI evidence which revealed he had a "fairly massive disc extrusion" with marked compression of the thecal sac and of the nerve root sleeves bilaterally. *See* Tr. 399 (October 2010 MRI which also showed "prominent" disc degeneration at the L4-L5 and L5-S1 levels and a central bulging disc at the L4-L5 level with an associated annular tear.). Additionally, subsequent imaging revealed anterior cord impingement, Tr. 346 (March 2013 MRI), and degenerative changes such as central canal stenosis and attenuation of the thecal sac, Tr. 310 (December 2013 CT scan).

Plaintiff also points to evidence showing he may satisfy the criteria under subsection (A). First, he notes MRI evidence of nerve root compression and compromise of his spinal cord, as detailed above. Plaintiff further points to evidence of ongoing neuro-anatomic pain (Tr. 313, 318, 322-23, 330, 332, 455, 463, 467, 496), and limited range of motion in his spine (Tr. 455, 464, 493, 497), as required under subsection (A). Additionally, there are records demonstrating motor loss, accompanied by reflex loss. *See* Tr. 455, 464, 468, 494, 497. Finally, there are some records demonstrating positive straight leg raising tests (both sitting and supine), as required, throughout the relevant period. *See* Tr. 455, 464, 468 (positive seated straight leg raising tests); Tr. 487, 494 (positive supine straight leg raising tests).

In her brief analysis of Listing 1.04, the ALJ incorrectly stated there is "no evidence" of any of these findings and hastily concluded Plaintiff does not meet the listing. (Tr. 14). However,

14

as Plaintiff has demonstrated here – some evidence does exist and it must be considered. *Reynolds*, 424 F. App'x at 416.

The Commissioner acknowledges that "while the ALJ's discussion at step three did not address with specificity medical evidence related to Listing 1.04, the ALJ did discuss evidence in the residual functional capacity analysis to support her listing determination." (Doc. 13, at 8) (footnote omitted). However, the Sixth Circuit has explicitly rejected adopting such a contention as improper *post hoc* reasoning. *See Harvey v. Comm'r of Soc. Sec.*, 2017 WL 4216585, at *6 (6th Cir.) ("But the district court should not have speculated what the ALJ may have concluded had he considered the medical evidence under the criteria in Listing 1.02."). Therefore, without the ALJ's factual analysis here, it is impossible for the Court to say that her decision at Step Three was supported by substantial evidence. *Id*. Said differently, the Commissioner's consideration of this evidence may or may not change the analysis. But that is not for this Court to decide. Because Plaintiff has pointed to evidence to raise a "substantial question" as to whether he meets or equals Listing 1.04A, *Smith-Johnson*, 579 F. App'x at 432, and the ALJ's reasoning is not supported by substantial evidence, the undersigned must recommend remand.

Treating Physician – Dr. Keppler

Plaintiff next argues the ALJ did not provide the required "good reasons" when assigning "limited" weight to the October 2017 opinion of Dr. Keppler (and its accompanying letter). (Doc. 11, at 10-15). The Commissioner responds that the ALJ's analysis is supported by substantial evidence. (Doc. 13, at 10-16). For the reasons discussed below, the undersigned finds the ALJ's analysis unsupported by substantial evidence and recommends the decision be reversed and remanded in this regard as well.

15

It is well accepted that medical opinions of treating physicians are accorded greater deference than non-treating physicians.[4] *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, the ALJ must give "good reasons" for the weight she gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544 (quoting SSR 96-2p, 1996 WL 374188, at *5). When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to

---

4. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

delineate good reasons, she is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

Here, the ALJ addressed Dr. Keppler's opinion, and the letter he submitted with it, and gave reasons for assigning it limited weight:

> On October 3, 2017, Dr. Keppler completed a form about the claimant accompanied by a letter dated September 28, 2017. Dr. Keppler opined that the claimant can lift/carry 5 pounds occasionally and 10 pounds "rarely"; occasionally reach, handle, and finger bilaterally; stand 2 hours, 15 minutes at a time, walk less than one hour, and sit less than 4 hours; cannot perform postural activities; and he would be absent from work 2 or more days per month (26F/2-7). Dr. Keppler stated that these restrictions persisted since at least March 15, 2009 (26F/6). However, the undersigned notes that Dr. Keppler did not begin to treat the claimant until May 2011.
>
> The undersigned gives limited weight to Dr. Keppler's opinion because it was completed in September/October 2017, and it is apparent from his letter dated September 28, 2017 that he considered events and clinical findings outside the relevant timeframe with a date last insured of December 31, 2013. For example, Dr. Keppler stated that that the claimant had two spinal fusion surgeries (the undersigned notes that these surgeries occurred in the relevant timeframe) and the claimant was involved in an "additional motor vehicle accident" (26F/2). Indeed, the medical evidence of record shows that in March 2015 the claimant was involved in a motor vehicle accident at 50 to 60 miles per hour in which his vehicle rolled ten times (7F/2; I0F/5), and in June 2016, Dr. Keppler indicated that the accident caused "additional injury to his spine" (12F/2). In the letter, Dr. Keppler also stated that the claimant underwent lumbar decompression at L-5 in September 2016, and the claimant has footdrop, not a surgery and not a clinical finding during the relevant timeframe (26F/2). The undersigned finds that the claimant's condition has worsened since December 31, 2013. The undersigned finds that Dr. Keppler considered medical evidence of record and events after December 31, 2013, and therefore gives limited weight to his opinion dated October 3, 2017.

(Tr. 22).

There is little doubt Dr. Keppler qualifies as a treating physician under the regulations based upon the in-depth nature and length of his medical relationship with Plaintiff. *See* 20 C.F.R. § 404.1527(c)(2). Dr. Keppler examined Plaintiff numerous times, and performed three surgeries,

17

all throughout the relevant period in connection with his spinal condition. *See* Tr. 313-56. In October of 2017, he provided a medical source statement (Tr. 1152-55), and a companion letter (Tr. 1150-51). In the letter, Dr. Keppler detailed Plaintiff's diagnoses and highlighted a few points within his treatment history. (Tr. 1150). As noted above, the ALJ dismissed Dr. Keppler's opinion because his letter addressed events subsequent to the relevant time period. (Tr. 22). Importantly, Dr. Keppler's discussion of these events is the *only reason* the ALJ gives for assigning the opinion limited weight. *Id*. This is problematic considering Dr. Keppler's letter also contains several major events in Plaintiff's medical history which did occur during the relevant time period, namely: two spinal fusion surgeries, "significant canal stenosis" at L4-L5, surgical instrumentation placement, and severe pain throughout the course of treatment – all of which the ALJ ignored or dismissed due to Dr. Keppler's discussion of the events occurring in 2016. (Tr. 1150). Most importantly, Dr. Keppler stated that "[Plaintiff's] condition existed and persisted with the restrictions as outlined in this Medical Source Statement since at least March 15, 2009[.]" (Tr. 1154) (emphasis in original). Generally speaking, "evidence of disability obtained after expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004); *see also Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 506 (6th Cir. 2013) (treating physician's opinions offered after date last insured were not entitled to significant weight). However, a treating physician's opinion given after the date last insured "may be considered to the extent it illuminates [a claimant's] health before the expiration of her insured status." *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452, 452 (6th Cir. 1999). Such a retrospective opinion must be supported by relevant, objective evidence during the relevant period. *See Strong*, 88 F. App'x at 845; *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994); 20 C.F.R. § 404.1527(d)(2)-(3).

Here, the ALJ dismissed Dr. Keppler's opinion that the restrictions listed dated back to March 2009 by noting that Dr. Keppler did not begin treating Plaintiff until 2011. (Tr. 22). However, her analysis ends there. While this may be a "good reason" for discounting Dr. Keppler's opinion from 2009 to 2011, it is not a "good reason" to discount it from 2011 to 2013 – well within the relevant time period. The ALJ's provided reason here does not even address the fact that Dr. Keppler *did* treat Plaintiff from 2011 to 2013 and he mentioned many of his treatments and clinical findings during this time period in the letter. *See* Tr. 1150-51. Specifically, the letter documents several events in Plaintiff's treatment history prior to his date last insured, specifically: two spinal fusion surgeries, a finding of "significant canal stenosis" at L4-L5, surgical instrumentation placement, and severe pain throughout the course of treatment. *Id*. The ALJ's analysis of Dr. Keppler's opinion falls short because she failed to conduct any analysis of whether Dr. Keppler's opinion was "supported by relevant, objective evidence during the relevant period." *Strong*, 88 F. App'x at 845.

The undersigned finds this single reason given by the ALJ for dismissing Dr. Keppler's opinion is not a sufficiently "good" one. As noted above, the ALJ is required to apply certain factors when assigning weight to a treating physician's opinion including the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ is not required to address every factor under the regulation, *Francis*, 414 F. App'x at 804-05, but her analysis must still provide an accurate and logical bridge between the evidence and the result, *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). Here, the logical bridge is missing. The ALJ failed to address Dr. Keppler's lengthy treatment relationship with Plaintiff which generated extensive treatment notes,

19

how those treatment notes (during the relevant time period) supported (or did not support) his medical source opinion, or how consistent Dr. Keppler's opinion is (or is not) with the other evidence of record. This is especially important where, as here, Dr. Keppler's opinion specifically notes that Plaintiff's condition, and the restrictions resulting therefrom, have existed since at least 2009. *See* Tr. 1154. Because the ALJ failed to provide the required "good reasons" when assigning Dr. Keppler's opinion limited weight, the undersigned finds her assessment is unsupported by substantial evidence and recommends the decision be remanded.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial evidence and recommends the decision be reversed and remanded for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).